| | | |
|---|---|---|
| Traci Haskell, | ) | |
| | ) | No. 11 C 7727 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| | ) | |
| Cook County Housing Authority, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Traci Haskell alleges that her former employer, Defendant Cook County Housing Authority ("Housing Authority"), discharged her in retaliation for reporting a racial slur made by her then-direct supervisor, Paul Pennock, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. The Housing Authority moves for summary judgment. R. 39. For the reasons below, the Housing Authority's motion is denied.

## Background

The following states the facts as favorably to Haskell as the record and Local Rule 56.1 require. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). In considering the Housing Authority's summary judgment motion, the Court gives Haskell the "benefit of conflicts in the admissible evidence and favorable inferences from that evidence" but does not vouch for them. *Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012).

Haskell is an African-American woman. R. 41, Pl.'s Stmt. of Additional Facts ("PSAF") ¶ 4. The Cook County Housing Authority hired Haskell as a property asset manager in October 2010. R. 39, Def.'s Stmt. of Facts ("DSOF") ¶ 1. Haskell's initial direct supervisor was Dennis Rhoades, but after the Housing Authority terminated his employment, Paul Pennock, Director of Asset Management at the Housing Authority, became Haskell's direct supervisor. DSOF ¶ 4. Pennock is white. PSAF ¶ 4.

On December 4, 2010, Pennock held a meeting with the south-side managers, including Haskell. DSOF ¶ 6. At the meeting, Pennock referred to Haskell as "ghetto."[1] PSAF ¶ 4. The comment offended Haskell. *Id.* Two to three weeks later, Haskell told Doris Stephenson, the Housing Authority's Director of Human Resources, about the comment that Pennock made at the meeting. DSOF ¶ 7; PSAF ¶ 5. Considering Haskell's communication to her to be a complaint of discrimination, Stephenson initiated an investigation. DSOF ¶ 9. After Haskell reported Pennock's comment, she noticed a change in his behavior toward her; while Pennock previously had been friendly towards her, he then became "distant and short." PSAF ¶ 12.

As part of the investigation, Stephenson interviewed Pennock on February 16, 2011. PSAF ¶ 7. After the interview, on February 23, 2011, Pennock wrote a memorandum addressed to Stephenson, regarding Haskell's "[r]ecent [a]llegation."

---

[1] The Housing Authority agrees that Pennock used the word "ghetto" but disputes that Pennock called Haskell "ghetto." R. 46, Def.'s Response to Pl.'s Stmt. of Facts ("DR") ¶ 4. For summary judgment purposes, the Court assumes that Haskell's account is true.

R. 41-3 at 2, Exh. C, Memorandum from Pennock to Stephenson. Pennock noted in the memorandum that he was unaware that the Housing Authority had policies against racism and harassment and denied that he used a "racial slur" during the December meeting. *Id.* Pennock stated that he "believe[d] [Haskell] [was] concerned about her job because things do not run well at her sites and she has performance issues." *Id.* He then explained the context surrounding the comment he made at the meeting:

> During my first week at the Agency, I had to tour [Haskell's] site with a vendor . . . . When we got into the parking lot . . . and were getting into cars, [Haskell] showed us her vehicle, which is a Jaguar, and stated "that's my car there; we cannot all fit into it[.]" I responded that it was in fact a very nice car. Her reply was "DON'T LET IT FOOL YOU, I CAN GET GHETTO WHEN I NEED TO."

*Id.* at 3 (capitalization in original). According to Pennock, after he terminated Rhoades' employment, he held a staff meeting for the south-side managers to advise them of that termination. *Id.* He then explained:

> I do remember using the word "ghetto." [Haskell] was talking about problems with [r]esidents at her family sites. We were talking about having to get tough with [r]esidents to pay rent and to evict people who were vandalizing the property. Additionally, we were talking about the gang/drug dealers on the street corners at her site. Traci was stating that she was not going to put up with the "trouble they are causing." Staff members were laughing in a way as if to say "what are you going to do, there is nothing to do[.]" So I commented back to [Haskell] stating "You told me you get ghetto when you have to. We need to get tough at these family sites and hold residents accountable for their actions[.]" She laughed and said "that's right[.]" The meeting continued to discuss the problems of the sites.

*Id.* Pennock concluded the memorandum:

> Traci remains as an employee because we have a responsibility to work with her to try and make her the best manager she can be. Until I am

> 100% convinced that she cannot be functional at her job, she remains as an employee. [Haskell] does, however, need to be told that making false accusations like this is not acceptable and could jeopardize her employment status in the future.

*Id.* at 4-5.

About a week after the Housing Authority received Haskell's complaint regarding Pennock's comment, it directed that Haskell report directly to Executive Director Lorri Newson. DSOF ¶ 11; PSAF ¶ 13. When Newson left the Housing Authority in June 2011, Haskell was then directed to report to Assistant Asset Director of the south-side properties, Michelle Gee. PSAF ¶ 14. At that time, Pennock was Gee's direct supervisor and had the authority to discipline, promote, demote, and fire Gee. PSAF ¶ 15. Once Gee became Pennock's Assistant Director, Haskell noticed a change in Gee's demeanor toward her. PSAF ¶ 16.

During June 2011, Gee assessed Haskell's job performance. As part of this assessment, she did not compare Haskell's performance to the performance of other asset managers. PSAF ¶ 22. She, however, discussed Haskell's job performance with Pennock, the Housing Authority's Chief Operating Officer Susan Weimer, and Stephenson. DSOF ¶ 27. When Gee spoke with Pennock, that discussion was part of their weekly meeting regarding her properties, but it included a 30-minute conversation about what action to take—written warning, suspension, or termination—regarding Haskell's employment. PSAF ¶ 20; R, 39-2 at 11. Prior to that meeting, the Housing Authority had erected a "wall" between Haskell and Pennock while the investigation of Pennock's comment was ongoing. R. 39-3 at 13-15, 17-18, 20-21. While this wall was in place, Gee was allowed to obtain

information from Pennock that would assist her in her decision regarding how to discipline Haskell, but Pennock was not to make the decision regarding what action to take regarding Haskell for Gee. *Id.* at 14-15, 17-18, 20-21.

On July 8, 2011, Gee and Stephenson met with Haskell, and Gee gave Haskell the Corrective Counseling Form that terminated her employment. DSOF ¶ 15; PSAF ¶ 18. Pennock was not present at this meeting. DSOF ¶ 16. The Corrective Counseling Form indicated that Haskell had "failed on several occasions to handle situations as they arrive at her property in a competent and efficient manner," noting specifically: (1) Haskell's mismanagement of the demolition of one her properties; (2) complaints from employees and residents about Haskell's demeanor; (3) Haskell's failure to mitigate emergencies in a timely manner; (4) Haskell's failure to complete reports and paperwork in an accurate and professional manner; and (5) Haskell's failure to be responsive to a vendor's requests and concerns. DSOF ¶ 19; *see also* R. 39-4 at 39, Corrective Counseling Form. At the meeting, Gee told Haskell that her discharge "came from [Pennock]," and Stephenson added that "this [the discharge] was a personal vendetta from [Pennock]." PSAF ¶ 19. At the end of the meeting, Stephenson gave Haskell the number of the Equal Employment Opportunity Commission ("EEOC"). PSAF ¶ 36.

On July 16, 2011, Haskell filed a charge of discrimination and retaliation with the EEOC. R. 1-4. On August 2, 2011, the EEOC issued a right-to-sue letter. R. 1-5. Haskell filed this lawsuit in October 2011, raising one count of retaliation in violation of Title VII. R. 1.

## Legal Standard

Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Egan Marine Corp. v. Great Am. Ins. Co. of New York*, 665 F.3d 800, 811 (7th Cir. 2011). A nonmovant must produce more than "a mere scintilla of evidence" to defeat summary judgment and "must come forward with specific facts demonstrating that there is a genuine issue for trial." *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010) (quoting *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008)). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis

Haskell alleges that the Housing Authority violated Title VII by firing her in retaliation for reporting the racial slur made by Pennock. Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), "seeks to prevent employer interference with unfettered access to Title VII's remedial mechanisms . . . by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 388 (7th Cir. 2012) (internal quotation marks omitted). A Title VII

plaintiff may establish unlawful retaliation using either the direct or indirect method of proof. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Although Haskell proceeds under both methods, only the direct method need be considered here.

Under the direct method, Haskell must demonstrate that "(1) [she] engaged in a statutorily protected activity; (2) [she] suffered a materially adverse action by [her] employer; and (3) a causal connection exists between the two." *Id.* The Housing Authority concedes that Haskell engaged in a protected activity when she reported Pennock's comment to Human Resource Director Stephenson and that Haskell suffered an adverse employment action when the Housing Authority discharged her. R. 40 at 7. The key question here concerns the third element: whether there is a casual connection between these two events.

Haskell can establish causation by showing that her reporting of Pennock's comment was a "substantial or motivating factor" in the Housing Authority's decision to discharge her. *Milligan*, 686 F.3d at 388. This may be done via direct evidence, "something akin to an admission by the employer ('I'm firing you because you had the nerve to accuse me of sex discrimination!')," or through "a convincing mosaic of circumstantial evidence that would permit the same inference [of retaliation] without the employer's admission." *O'Leary v. Accretive Health, Inc.* 657 F.3d 625, 630 (7th Cir. 2011) (some internal quotation marks omitted). Such circumstantial evidence may consist of (1) "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other

employees in the protected group, and other bits and pieces from which an inference of causation may be drawn," (2) "evidence showing that the employer systematically treated other, similarly situated . . . employees better," or (3) evidence that . . . the employer's justification [for the adverse action] was pretextual." *Milligan*, 686 F.3d at 389 (internal quotation marks omitted). Ultimately, the appropriate focus is "not whether the evidence offered is direct or circumstantial but rather whether the evidence points directly to a discriminatory reason for the employer's action." *Id.* (internal quotation marks omitted).

Haskell relies on a combination of circumstantial evidence to establish causation under the direct method: (1) Haskell's testimony at the deposition about (a) Michelle Gee's statement made at Haskell's discharge meeting that Haskell's termination "came from [Pennock]," PSAF ¶ 19; and (b) Doris Stephenson's statement that "this [the firing] was a personal vendetta from [Pennock]," *id.*; (2) the February 23, 2011 memorandum from Pennock to Stephenson, which stated, among other things, that making false accusations was "not acceptable and could jeopardize [Haskell's] employment status in the future," R. 41-3 at 5; (3) the suspicious timing between the change in Haskell's reporting relationship from Lorri Newsom to Gee (who reported to Pennock) in June 2011, on the one hand, and Haskell's termination in July 2011, on the other; (4) Gee's admission in her deposition testimony to having a conversation with Pennock about Haskell prior to Haskell's discharge," DSOF ¶ 27; (5) Gee's statement to Stephenson (established in an affidavit from Stephenson filed in support of Haskell's response to the motion for

summary judgment after the close of discovery) that the Housing Authority had no grounds to terminate Haskell's employment, R. 41-1 at 2-3; and (6) the Housing Authority's failure to follow its progressive discipline policy before discharging Haskell (also established in Stephenson's affidavit), *id.* at 3.

The Housing Authority challenges Haskell's first two pieces of circumstantial evidence—Gee's and Stephenson's statements to Haskell that Haskell's termination was a directive from Pennock, PSAF ¶ 19—as inadmissible hearsay that cannot be used to create a genuine issue of material fact. Because "hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial," *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997), "a party may not rely on inadmissible hearsay to avoid summary judgment," *MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011). Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *Jordan v. Binns*, — F.3d —, No. 11-2134, 2013 WL 1338049, at *2 (7th Cir. Apr. 4, 2013) (citing Fed. R. Evid. 801(c)). For out-of-court statements offered for their truth to be admissible, the proponent of the statement must establish that an exception applies or that the statement is non-hearsay. *Makowski v. SmithAmundsen, LLC*, 662 F.3d 818, 822 (7th Cir. 2011).

Beginning with Gee's statement to Haskell that the discharge "came from [Pennock]," PSAF ¶ 19, because Gee's statement constitutes an admission by an agent or employee of an opposing party under Federal Rule of Evidence 801(d)(2)(D), it is not hearsay and the court may consider it for summary judgment

purposes.[2] Rule 801(d)(2)(D) provides that a statement is not hearsay if the statement is offered against an opposing party and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." *See also Stephens*, 569 F.3d at 793 ("For an agent's statement regarding an employment action to constitute an admission, . . . her duties must encompass some responsibility related to the decisionmaking process affecting the employment action.") (internal quotation marks omitted); *Simple v. Walgreen Co.*, 511 F.3d 668, 672 (7th Cir. 2007).

Here, Gee holds a management position with the Housing Authority—she is the Assistant Asset Director—and was directly involved in the decision to discharge her. Indeed, by arguing that "it was Ms. Gee's decision alone to terminate [Haskell]," R. 40 at 7; R. 45 at 8, the Housing Authority concedes that Gee was involved in the decisionmaking process to terminate Haskell's employment. Gee denies saying that that the directive to discharge Haskell came from Pennock, R. 39-2 at 18, and she may, of course, disavow that statement at trial, but Haskell, as the non-movant, is entitled to the benefit of any conflicts in the evidence at this stage. *Smith*, 681 F.3d at 892. Because Gee was involved in the decisionmaking process leading to the employment action of Haskell's termination, her statement falls within the scope of her employment, is admissible as non-hearsay under Rule 801(d)(2)(D), and may be considered for purposes of summary judgment.

---

[2] The Housing Authority suggests that Haskell might argue that Gee's statement falls within Rule 804(b)(3)'s statement against interest exception. Rule 804(b)(3) applies when the declarant is unavailable. Haskell has made no allegation that the declarant, Gee, is unavailable.

The Housing Authority nevertheless contends that even if Gee's statement is admissible, Haskell's contradictory deposition testimony does not allow the court to credit it. Although Haskell testified at her deposition that she "[did not] have any proof [of Pennock's direct involvement]" in her discharge, DSOF ¶ 20; R. 39-1 at 15, Haskell somewhat inconsistently repeatedly testified that Gee told her that Pennock directed her discharge. R. 39-1 at 12 ("[Gee] sa[id] [the discharge] came from [Pennock.]"); *id.* (testifying Pennock was behind the discharge "[b]ecause he was mad [Haskell] reported him to [Stephenson]"); *id.* at 16 ("I think [the discharge] was a form of retaliation because I told on Mr. Pennock. And Michelle was doing anything that she could to get brownie points from Mr. Pennock."); *id.* ("[Gee] said that she had nothing to do with [Haskell's discharge] and that [it] was coming from [Pennock]."). The Court will not fault Haskell, a lay witness, for a negative answer in response to a question that called for "proof" when it is clear from the remainder of her testimony that Gee's statement about Pennock is admissible evidence. Accordingly, Haskell's deposition testimony regarding lack of proof is something on which she may be cross-examined at trial, but it does not preclude the Court from considering Gee's statement for summary judgment purposes.

To support an inference of retaliation, Haskell further relies on Doris Stephenson's statement to her that "this [the firing] was a personal vendetta from [Pennock]." PSAF ¶ 19. As an out-of-court statement offered for its truth—that Pennock terminated Haskell as a result of a personal vendetta—Stephenson's statement falls under the definition of hearsay. As with Gee's statement, the

question is whether Stephenson's statement concerned a matter within the scope of her employment and is therefore an admission under Rule 801(d)(2)(D). "Involvement in the process leading up to the employment action at issue is enough to make an employee's statement an admission." *Makowski,* 662 F.3d at 822-23.

Here, the Housing Authority and Haskell agree that Gee consulted with Stephenson, the Director of Human Resources, regarding Haskell's potential termination, though the parties dispute the content of the conversation.[3] DSOF ¶ 27; R. 41, Pl.'s Resp. to DSOF ¶ 27 (admitting that Gee spoke "with her superiors," including Stephenson prior to Haskell's termination). Stephenson's duties as Human Resources Director included not only investigating employee complaints of discrimination and retaliation, but assisting management in employment decisions such as discipline and firing and attending meetings where employees were terminated. R. 41-1 at 2, Stephenson's Declaration. Although Stephenson was not the individual who terminated Haskell, she was asked to confer with management regarding the decision to do so. Accordingly, construing the facts in the light most favorable to Haskell, the Court finds that Stephenson's statement falls within the scope of her employment and is admissible as non-hearsay under Rule 801(d)(2)(D).[4]

---

[3] Gee testified at her deposition that at the time she consulted with Stephenson, she was deciding whether to issue Haskell a written warning for her sub-par performance or discharge her. R. 39-2 at 7. According to Gee, Stephenson told Gee that because Haskell was reporting to her, it was Gee's decision as to whether to terminate her. *Id.*

[4] The Housing Authority points out that Stephenson's affidavit does not confirm Haskell's account of Stephenson's statement. True, but this is a point that may bear on Stephenson's credibility and therefore is not an issue for the Court at this time. *See, e.g., Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.,* 528 F.3d 508, 512 (7th

The Housing Authority argues that even if Gee's and Stephenson's comments attributing Haskell's discharge to Pennock are admissible, they are immaterial because there is no evidence that Pennock was the "driving force behind [Haskell's] termination." R. 45 at 3. To prevail on her retaliation claim, Haskell must either "provide direct or circumstantial evidence that the *decisionmaker* has acted for a prohibited reason," *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 378-79 (7th Cir. 2011) (emphasis in original), or show that her immediate supervisor "perform[ed] an act motivated by [a prohibited] animus that is *intended* by the supervisor to cause an adverse employment action" and was in fact "a proximate cause of the ultimate employment action." *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011) (emphasis in original). Haskell argues that Pennock had a retaliatory motive arising from his desire to punish Haskell for reporting Pennock's racial comment to Human Resources, and that Gee was essentially "the unwitting manager or supervisor who [was] persuaded to act based on [Pennock's] illegal bias." *Schandelmeier-Bartels*, 634 F.3d at 379; *see also Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012). With this argument, Haskell seeks to invoke the "cat's paw" theory of liability.[5]

_____

Cir. 2008) ("A court's role [in ruling on a summary judgment motion] is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact.").

[5] Although Haskell does not explicitly invoke the "cat's paw" theory of liability in her response brief, the Court reads Haskell's brief to raise it. Haskell points to the following chain of events to support her retaliation claim, which call to mind the cat's paw theory: Pennock's threat to Haskell's employment following her reporting of Pennock's comment, the change in Haskell's reporting relationship back to

13

"The existence of [a causal] link between an employment decision made by an unbiased individual and the impermissible bias of a non-decisionmaking co-worker has become known . . . as the 'cat's paw' theory." *Schandelmeier-Bartels*, 634 F.3d at 379. This theory allows for employer liability where a plaintiff seeks to hold an employer liable for the animus of an employee who did not make the ultimate employment decision." *Staub*, 131 S. Ct. at 1192. In other words, even if Pennock exhibited retaliatory animus, for Haskell to prevail under the cat's paw theory, she must also demonstrate (1) that Pennock acted upon that retaliatory animus with the intention of causing Gee to terminate Haskell's employment, and (2) that Pennock's actions were a proximate cause of Haskell's discharge. *Id.* at 1195.

Here, a jury could reasonably infer from Pennock's change in behavior following Haskell's reporting of Pennock's comment and Pennock's memorandum that Pennock exhibited retaliatory animus. The memorandum Pennock wrote to Stephenson regarding the "[r]ecent [a]llegation of Traci Haskell" indicated that Pennock was "very upset" about Haskell's reporting of his "ghetto" comment and the investigation that followed. PSAF ¶ 10; *see also* R. 41-3 at 2-5. Although Pennock noted in his memorandum that Haskell would remain as an employee until he was "100% convinced that she cannot be functional at her job," his ensuing statement said: "[Haskell] does, however, need to be told that making false accusations like

---

Pennock's change of command and her discharge one month later, Gee's admission that she consulted with Pennock regarding what disciplinary action to take regarding Haskell, and Gee's and Stephenson's statements that Haskell's termination was a directive from Pennock.

this is not acceptable and could jeopardize her employment status in the future." R. 41-3 at 5.

Merely demonstrating retaliatory animus is insufficient to demonstrate the cat's paw theory of liability without "some direct relation between the injury asserted and the injurious conduct alleged." *Staub*, 131 S. Ct. at 1192 (internal quotation marks omitted). A reasonable jury could infer such a direct relation from Haskell's evidence. Here, Gee admittedly consulted with Pennock regarding Haskell's termination. DSOF ¶ 27. Gee testified that prior to Haskell's termination she spoke with Pennock (albeit as part of a weekly meeting with him regarding her region) regarding Haskell's job performance and Gee's decision about whether to issue a written warning, suspend, or discharge Haskell. R. 39-2 at 12-13. A week after that conversation, Gee terminated Haskell. The Housing Authority attempts to diffuse the impact of that conversation by pointing to Gee's testimony that Pennock told her that the decision regarding what action to take was ultimately Gee's to make. But Haskell also has as part of her evidence Gee's and Stephenson's statements that the directive to discharge her came from Pennock. Viewing all this evidence in the light most favorable to Haskell and drawing all reasonable inferences in Haskell's favor, a reasonable jury could infer from the "convincing mosaic" of circumstantial evidence Haskell has assembled that Pennock had retaliatory animus toward Haskell and then exercised that retaliatory animus when advising Gee regarding what action to take, which resulted in her termination. Accordingly, even if Gee exercised some independent judgment in deciding to

terminate Haskell, it cannot be said that there is no genuine issue of material fact as to whether there is a "direct relation" between Haskell's termination and Pennock's retaliatory animus. *See Staub*, 131 S. Ct. at 1192-93 ("An employer's authority to reward, punish, or dismiss is often allocated among multiple agents. The one who makes the ultimate decision does so on the basis of performance assessments by other supervisors."); *Hicks v. Forest Preserve Dist. of Cook Cnty.*, 677 F.3d 781, 790 (7th Cir. 2012) (holding that "cat's paw" theory applied where decisionmaker relied on disciplinary complaint submitted by supervisor who bore animus against plaintiff); *cf. Harper v. C.R. England, Inc.*, 687 F.3d 297, 309 (7th Cir. 2012) (holding "cat's paw" theory did not apply where no evidence in record suggested decisionmaker's decision to fire employee was influenced by plaintiff's supervisor).

The Housing Authority argues that the five-month interval between Haskell's reporting of Pennock's "ghetto" comment and her discharge defeats causation. But the lapse of time between protected activity and an adverse action has never been "dispositive in proving or disproving a causal link" between an employee's participation in a protected activity and a subsequent adverse employment action. *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003); *see also Hicks*, 677 F.3d at 789 ("While close timing between a plaintiff engaging in a protected activity and then suffering an adverse employment action is useful evidence to establish a causal link between the two events, the law does not require there to be close timing where, as here, direct evidence is used to establish causation."); *Coleman v.*

*Donahoe*, 667 F.3d 835, 861 (7th Cir. 2012) ("Our cases reject any bright-line numeric rule, but when there is corroborating evidence of retaliatory motive, as there is here, an interval of a few weeks or even months may provide probative evidence of the required causal nexus."); *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 485 (7th Cir. 1996) (citing cases for proposition that retaliation claims can proceed despite year-long interval between protected conduct and retaliation where there were "additional circumstances [that] raised suspicion about the legitimacy of the employer's acts").

Moreover, Haskell discounts the five-month interval, arguing that the timing of her discharge is actually "more suspicious than at first glance, because [the Housing Authority] took its first opportunity to retaliate after [she] was no longer protected by having been moved out of Director Pennock's chain-of-command." R. 42 at 14. A reasonable jury could find the timing of the events suspicious. That is, a reasonable jury could infer from the evidence that Pennock nursed a grudge against Haskell but had no opportunity to act on it until Haskell returned to his reporting line, and then once that occurred, he acted at the first opportunity, advising his subordinate Gee, who had the authority to terminate Haskell. *See McGuire v. City of Springfield*, 280 F.3d 794, 797 (7th Cir. 2002) (stating long delay not necessarily so long as to prevent inference of retaliation where employer acted at early opportunity).

In any event, Haskell does not rely exclusively on timing, as other circumstantial evidence in the record, together with timing is sufficient to permit a

jury to conclude that she was terminated in retaliation for reporting Pennock's "ghetto" comment. This evidence included: Gee and Stephenson's statements attributing Haskell's discharge to Pennock—Stephenson's in particular indicating her discharge was a "personal vendetta" from Pennock—Pennock's memorandum to Stephenson which contained—though interspersed with an assessment of Haskell's sub-par work performance—an implied threat to Haskell's employment based on her "false accusation"; the change in Pennock's attitude toward Haskell after she reported his comment; the fact that Pennock consulted with Gee about Haskell's termination; and finally, that Haskell was terminated at the first opportunity once she returned to Pennock's reporting chain.

Also part of Haskell's mosaic of circumstantial evidence supporting an inference of retaliation is evidence she argues supports her claim that the Housing Authority's justification for her discharge—substandard performance—was pretextual. Haskell relies primarily on Stephenson's affidavit to establish pretext. The Housing Authority attacks the "self-serving" affidavit as containing inadmissible hearsay and lacking support in the record.

In her affidavit, Stephenson avers that while she was employed as the Housing Authority's Director of Human Resources, the Housing Authority had a standard practice of progressive discipline that applied to at-will union and non-union employees. R. 41-1 at 2. The discipline began with a verbal warning, then progressed to a written warning, and then finally ended with termination, if warranted. *Id.* According to Stephenson, Haskell's termination violated this

progressive-discipline policy because Haskell had never been disciplined prior to her termination. *Id.* at 3. In fact, Stephenson stated that while she was employed by the Housing Authority, she never heard any complaints from residents or non-management personnel about Haskell's behavior, communications, or job performance. *Id.* To support this claim, Stephenson recounted an incident which occurred right after Haskell's discharge meeting where one of Haskell's residents told her and Gee that "[Haskell] was nice and a good person." *Id.* In her affidavit, Stephenson also recounts certain statements from Gee. Once, Stephenson overheard Gee speaking with Chief Operating Officer Susan Weimer, and during that conversation, Gee told Weimer that she "wasn't sure about going forward with [Haskell's firing] because she didn't feel that the [Housing Authority] had grounds to fire [Haskell]." *Id.* at 2. Stephenson also states that Gee told her that "there was no documentation supporting the [Housing Authority's] firing of [Haskell], that the [Housing Authority] did not have grounds to fire [Haskell], and that [Haskell] did not deserve to be fired." *Id.* at 2-3.

The Housing Authority challenges the statements in Stephenson's affidavit as inadmissible hearsay. The Court agrees with the Housing Authority that the statement by the unnamed resident regarding Haskell's good character is inadmissible hearsay and will not consider it.[6] The Court, however, disagrees, that Stephenson's statements recounting Gee's statements are inadmissible hearsay.

---

[6] Even if this statement were admissible, the Court notes that its value to Haskell's case is minimal. That one resident stated that Haskell "was nice and a good person" adds little to Haskell's circumstantial evidence of pretext.

Like the statement from Gee regarding Pennock's role in Haskell's termination, these statements are admissions under Rule 801(d)(2)(D). Gee's statements to Weimer and to Stephenson were made concerning a matter within the scope of Gee's employment—whether to discharge Haskell—and were made during the existence of that employment relationship. Fed. R. Evid. 801(d)(2)(D). Accordingly, they are non-hearsay, admissible under Rule 801(d)(2)(D).

The Housing Authority further disputes Stephenson's account of a progressive discipline policy for at-will employees at the time that Haskell was terminated, pointing to its 2003 Employee Handbook, which the Housing Authority argues directly refutes Stephenson's claim. R. 46-1, 2003 Employee Handbook. The Handbook lists certain conduct "that may result in disciplinary action, up to and including termination." *Id.* at 20-23. According to the Housing Authority, the conduct ascribed to Haskell in the Corrective Counseling Form warranting Haskell's discharge is conduct listed as "terminable" in the Employee Handbook. Because the Employee Handbook refutes Stephenson's claim, the Housing Authority asserts that it has no support in the record, and should therefore not be considered.

Under Federal Rule of Civil Procedure 56(c)(4), an affidavit used to support a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *See also Luster v. Illinois Dep't. of Corr.*, 652 F.3d 726, 731 n. 2 (7th Cir. 2011). The Housing Authority has not demonstrated

how Stephenson's assertion regarding a progressive discipline policy fails to satisfy Rule 56(c)(4)'s requirements. Citing *Quarles v. JP Morgan Chase Bank, N.A.*, No. 11 C 8582, 2012 WL 3890134, at *2 (N.D. Ill. Sept. 7, 2012), and *Northern Indiana Gun & Outdoor Shows*, 163 F.3d 449, 454 (7th Cir. 1998), the Housing Authority points to the well-established rule that when a written instrument contradicts allegations in a complaint, the exhibit trumps the allegations. But these cases applied this rule in the context of a Rule 12(b)(6) motion to dismiss and a Rule 12(c) motion for judgment on the pleadings. Here, the Employee Handbook casts doubt on Stephenson's claim of a progressive discipline policy, but Stephenson avers based on her personal knowledge that such a policy, albeit informal, existed. That is sufficient at this stage to consider this piece of evidence for purposes of summary judgment. The Housing Authority may of course present the Employee Handbook as evidence to rebut Stephenson's claim that a progressive discipline policy existed. But ultimately, any concerns about the veracity of Stephenson's account go to its weight, not admissibility.

Haskell alleges that she never received any official oral or written discipline for her alleged substandard performance, and accordingly, the Housing Authority failed to follow its own progressive discipline policy when it terminated her. This, Haskell claims, is evidence that the Housing Authority's justification for her discharge was pretext. The Housing Authority agrees that Haskell received no official discipline for her performance, R. 39-2 at 9-10, and that throughout her employment, she had received favorable statements from certain tenants (but not

co-workers) regarding her work performance, DR ¶ 2, but notes that Haskell was given numerous unofficial warnings regarding her work performance, R. 39-2 at 20. Gee testified about these unofficial warnings, and the Corrective Counseling Form noted "repeated informal conversations with [Haskell] about her need to get on top of her property and to get things completed at her sites" but that "[d]espite several conversations about expectations and training, [Haskell's] job performance [was] not sufficient enough to meet the demands that are required at the properties she is currently responsible for." R. 39-4 at 40, Corrective Counseling Form. Gee further testified that in reviewing Haskell's performance, she reviewed her own conversations and interactions with Haskell as well as emails she received from other departments and reports about Haskell, but acknowledged that she did not compare Haskell's performance to that of other asset managers. PSAF ¶ 22; R. 39-2 at 8-9, 13. The Court finds that there are material factual disputes regarding whether Haskell's substandard performance justified her termination irrespective of any retaliatory motive. Considered in conjunction with Haskell's other circumstantial evidence pointing to Pennock's retaliatory animus and his potential role in the decisionmaking process, Haskell has adduced sufficient evidence to allow a jury to reasonably reject the Housing Authority's nondiscriminatory rationale for her termination.

In sum, Gee's and Stephenson's statements, when considered along with Pennock's February 23, 2011 memorandum, the suspicious timing of Haskell's termination once she was returned to Pennock's reporting line, Gee's admitted

discussion with Pennock regarding Haskell, and evidence potentially refuting the Housing Authority's rationale for Haskell's termination present "a convincing mosaic of circumstantial evidence" from which a jury could reasonably infer that a retaliatory animus from Pennock motivated the decision to terminate Haskell. Taking all inferences in the light most favorable to Haskell, she has established genuine issues of material fact as to the requisite causal nexus between her reporting of Pennock's comment and her termination. This is of course not to say that Haskell will prevail at trial. There is evidence in the record that would allow a reasonable jury to conclude that Haskell's performance was substandard, that Haskell was given opportunities to improve, and that her termination was justified, and not the result of a complaint she made months earlier about Pennock. But the record does not permit that determination to be made at summary judgment.

## Conclusion

For the foregoing reasons, the Housing Authority's motion for summary judgment is denied.

ENTERED:

_Thomas M Durkin_
Honorable Thomas M. Durkin
United States District Judge

Dated: May 9, 2013